DONAL C. NOONAN and RUTH H. NOONAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Noonan v. Commissioner
Docket Nos. 16879-83, 31318-84, 34490-84, 126-85, 6123-85, 8339-85, 10859-85, 12358-85, 13473-85, 15725-85, 18606-85, 24858-85, 35031-85, 4957-86, 8227-86.
United States Tax Court
T.C. Memo 1986-449; 1986 Tax Ct. Memo LEXIS 158; 52 T.C.M. (CCH) 534; T.C.M. (RIA) 86449; September 17, 1986. Martin N. Gelfand and William M. Weintraub, for the petitioners. Martin D. Cohen and William H. Quealy, Jr., for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: These consolidated "test case petitioners" were selected by counsel and approved by the Court to serve as test cases for resolving numerous issues common to a much larger group of petitioners who invested during 1980 through 1982 in refrigerated intermodal containers marketed by or on behalf of FoodSource, Inc. Appendix A sets forth petitioners by name and docket number, the tax years involved, the deficiencies and additions to tax for each year, and the place of residence of each individual test case petitioner. The issues presented are whether petitioners are entitled to investment tax credits and depreciation or other deductions claimed with respect to the containers. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts and attached exhibits are incorporated in our findings by this reference. Background of FoodSource
*161 FoodSource, Inc. (FoodSource) was a California corporation formed in late 1979 by David A. Dixon (Dixon) and Marshall Boyar to manufacture and sell controlled atmosphere containers for post-harvest preservation and transportation of perishable agricultural commodities. At all times relevant to the present cases, Dixon either owned or controlled a majority of the outstanding common stock of FoodSource. Dixon, an engineer, began researching the preservation of perishables in approximately 1960, when he was West Coast regional manager of the Cryogenics Division of Union Carbide Corporation. Between 1964 and 1971 Dixon applied for and, as assignor to certain corporations employing him, received five patents relating to a controlled atmosphere process that he developed. This process involved placing perishable products into a compartment; rapidly reducing the temperature and, by introducing inert gases, reducing the oxygen level within the compartment; and monitoring and maintaining precisely the level of oxygen. Dixon's research and other scientific studies indicated that fresh fruits and vegetables ripened and decayed more slowly in this reduced oxygen atmosphere (between one quarter *162 of 1 percent and 4 percent oxygen, depending upon the commodity) than in normal atmosphere. The five patents became known as the Oxytrol patents. On February 11, 1977, Furukawa Oxytrol, Inc. (FOI), then owner of the Oxytrol patents, granted a nonexclusive license to Senter & Corgan, Inc. (Senter) to use and furnish to customers the Oxytrol system. The term of the license extended until expiration of the last patent, unless the agreement was earlier terminated by Senter. Senter also acquired hardware necessary for equipping 40 or 50 refrigerated transportation containers with the Oxytrol system. Such hardware consisted primarily of a tank of liquid nitrogen to be placed in the nose of the container and a controller to maintain a selected oxygen level by releasing the nitrogen into the container as needed. Senter offered to sell such systems to container owners for $10,000 (including installation). Despite the substantial sales efforts of Senter and Trans Fresh Corporation (Trans Fresh), a related corporation that continued marketing the systems after Senter was reorganized in 1981 or 1982, no systems had been sold as of the time of trial of this case in October and December 1985. *163 [2]
Contemporaneously with the unsuccessful efforts to sell the Oxytrol system, Trans Fresh was quite successful in selling its Tectrol modified atmosphere system, for which it charged $250. A modified atmosphere system differs from a controlled atmosphere system (such as the Oxytrol system) in that inert gases are introduced into the sealed container only immediately after loading; the level of oxygen in the container is not monitored or controlled thereafter. On December 22, 1977, Dixon obtained from Furukawa International USA, Inc. (Furukawa) an exclusive license to make, use and sell any device utilizing one or more of the five Oxytrol patents. The grant of the license to Dixon was subject to the license *164 previously granted to Senter by FOI. In exchange for the license, Dixon agreed to pay Furukawa royalties of $1,000 for each device sold or leased by Dixon. The agreement also provided for minimum royalties of $5,000 per month. On December 23, 1977, Dixon granted to Nitrol Corporation an exclusive sub-license to make, use, and sell any device utilizing the Oxytrol patents. Nitrol Corporation sold controlled atmosphere refrigerated highway freight trailers purchased by the taxpayers as described in detail in Sutton v. Commissioner,84 T.C. 210 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986). The trailers sold by Nitrol Corporation used United States Patent No. 3,962,477 issued to Dixon in 1976 (the "477 patent") and subsequently licensed by him to Nitrol Corporation. The 477 patent involved the maintenance of controlled atmosphere through the premixing of liquid oxygen and nitrogen in a storage tank and the continuous introduction of gas from the mixture into the storage container. In the application for this patent, Dixon stated: Control of oxygen concentration in conventional storage compartments is presently accomplished in a number of *165 ways, the most common being the use of an oxygen sensing device in combination with separate sources of nitrogen and oxygen. In operation, when the oxygen concentration rises above the desired maximum, the sensing device, disposed within the storage compartment, activates a valve controlling the nitrogen source. As a result, a sufficient quantity of nitrogen is introduced to reduce the oxygen concentration to within the desired range. Conversely, when the oxygen concentration falls below the minimum required, the sensing device either similarly activates a value controlling the oxygen source or deactivates the nitrogen source. In the latter case, and through utilization of a permeable storage unit, the oxygen source can be ambient air that diffuses into the compartment when the nitrogen source is deactivated. In this manner, increments of oxygen or nitrogen are provided to the storage compartment in response to the appropriate signal from the sensing device to maintain the oxygen concentration in the desired range. However, such prior art procedures are of limited application as they are by necessity of elaborate and costly construction and somewhat unreliable. Although systems *166 utilizing either a single storage tank containing a pre-mixture of oxygen and an inert gas such as nitrogen, or separate oxygen and inert gas tanks have been developed, the high pressure storage tanks required are very heavy and greatly increase the weight and space burden when used in in-transit applications. In addition, such systems suffer from the inherent problems associated with operation at high pressure. The sub-license for the Oxytrol patents granted to Nitrol Corporation terminated when Nitrol Corporation defaulted on its obligations under the December 23, 1977 agreement. On April 1, 1980, Dixon and Furukawa terminated their December 22, 1977 agreement. On April 7, 1980, Furukawa and FoodSource entered into an exclusive license agreement that was identical in all material respects to the agreement between Furukawa and Dixon. The FoodSource Containers
During 1980, 1981, and 1982, FoodSource sold interests in controlled atmosphere refrigerated containers to various investors, including petitioners. [3] FoodSource allowed each investor to purchase as little as a 10 percent undivided interest in a container. Independent sales representatives, to whom FoodSource paid *167 sales commissions, generated substantially all of the approximately 5,000 sales of contrainer interests. FoodSource used at least eight different versions of offering memoranda in connection with the containers, which FoodSource marketed under the name Nitrol. Each version contained the following description of the Nitrol system: The Nitrol system of controlled atmosphere transportation of perishable products is technically correct, simply to operate, and safe from practical failure. Under a number of patents, it operates in one of two different ways, depending upon the general application. In the first mode the Nitrol tank is filled with liquified nitrogen and oxygen precisely mixed so that exactly the right level of oxygen will be maintained in the trailer during transit. Following an initial purging of the interior air, the gas mixture, say 1% oxygen and 99% nitrogen, flows continuously into the trailer to maintain the oxygen level constant *168 while forcing out the harmful by-products of respiration such as carbon dioxide and ethylene. There is nothing for the carrier to adjust during transport, as the proper gas atmosphere is chosen and mixed at the time of loading, and there are no moving parts to fail. The second Nitrol mode uses only liquified nitrogen and calls for it on demand, using a solid-state pre-set oxygen level control to rapidly reduce oxygen level in the transport compartment to the proper level. Additional nitrogen continues to flow slowly into the compartment during transit to purge respiratory by-products, and of course "live" cargo such as produce continues to use some of the remaining oxygen in the van. The controller then lets air flow into the compartment when the oxygen level gets too low. A typical oxygen control level is 1%, around which the controller will allow 1/2% deviation. FoodSource employed experts in post-harvest technology, who researched and designed the container unit that it sold. Each container sold by FoodSource consisted of a 40-foot insulated container box, an electric refrigeration unit, and an oxygen analyzer, each of which FoodSource purchased from independent manufacturers. *169 FoodSource paid approximately $17,000 to $18,000 for each container box, $10,000 for each refrigeration unit, and $1,000 for each oxygen analyzer. As sold by FoodSource, the container did not include a chassis for road and "piggyback" rail transportation, a diesel-powered generator to run the refrigeration unit, or a tank to hold the gases necessary for the controlled atmosphere process, although pictures of the container in the offering memoranda included these items. FoodSource charged $260,000 per container (or a prorated amount for less than an entire interest); however, the form of payment varied substantially among the eight offering memoranda. The terms of the initial offering in 1980 were $26,000 down and a $234,000 nonrecourse note bearing 6 percent simple interest and payable in 180 equal monthly installments. In the second and third memoranda, FoodSource changed these terms to $39,000 down and a $221,000 nonrecourse note. The fourth offering called for $45,000 down and a $215,000 note bearing 9 percent simple interest and payable in 240 equal monthly installments. Although the note was labeled recourse as to principal, any purchaser who allowed FoodSource to take *170 possession of and operate his container could limit the payments of the note during the 20-year period to the operating profit generated by the container. The terms in the fifth offering were as follows: Purchase terms are Forty-Five Thousand Dollars ($45,000.00) down and a partial recourse promissory note for the balance of Four Hundred Ninety-Two Thousand Three Hundred Two and 40/100 Dollars ($492,302.40), i.e., the buyer is personally liable for the first Two Hundred Fifteen Thousand Dollars ($215,000.00) of such promissory note, payable in 240 equal monthly installments of Two Thousand Fifty One and 27/100 Dollars ($2,051.26) [sic] each, without interest. Said installment payments commence as of the first day of the third month following the purchase of the Container. Even though the note does not provide for the payment of interest, under the applicable provisions of the Internal Revenue Code of 1954, as amended, a portion of certain of the installments will be treated as interest. Under the applicable rules, no portion of the first four installment payments will be treated as interest; however, as to each installment payment thereafter, i.e., the final 236 payments, Eleven *171 Hundred Seventy-Five and 01/100 Dollars ($1,175.01) thereof will be treated as interest. Based upon the tables published by the Internal Revenue Service, the principal amount of the note is Two Hundred Fifteen Thousand Dollars ($215,000.00) and the remainder of the total installment payments, or Two Hundred Seventy-Seven Thousand Three Hundred Two and 40/100 Dollars ($277,302.40), is interest. Thus, the total principal amount being paid for a Container is Two Hundred Sixty Thousand Dollars ($260,000.00); Forty-Five Thousand Dollars ($45,000.00) down payment plus Two Hundred Fifteen Thousand Dollars ($215,000.00) principal portion of the note. * * * As with the fourth offering, the purchaser could defer out-of-pocket note payments during the 20 years after purchase by allowing FoodSource to operate the container. In the Sixth format, FoodSource offered similar terms but increased the down payment to $52,000. The seventh and eighth offering memoranda were identical to the sixth, except that no provision was made for the deferral of loan payments through FoodSource's operating the container, and FoodSource could sell the container and collect from the owner any balance remaining *172 on the debt in excess of the sales proceeds. Each of the notes without stated interest provided that payments received thereon would be allocated first to the recourse portion of the note. The notes used in connection with the seventh and eighth offerings stated that they could not be assigned by FoodSource without prior written consent of the purchaser. In the contract of sale between FoodSource and the container purchaser (entitled Purchase and Security Agreement), FoodSource agreed to make available to the purchaser without cost "any other products of * * * [FoodSource] constituting improvements to the [Nitrol] System resulting from patents derived from the technology which created the System." The Purchase and Security Agreement required the purchaser of any container to maintain a commercial material damage insurance policy in the amount of $260,000. FoodSource arranged for independent insurance companies to provide such a policy for $75 per month (per container). During the years in issue, the liability of the insurance companies under the policies was limited to repair or replacement cost of the containers. The contract of sale also required the purchaser to repair *173 and maintain the container until full payment on the note to FoodSource. The offering memoranda contained an optional agreement through which the purchaser could engage Container Maintenance Company to perform necessary repair and maintenance services for $340 per month. The first two offering memoranda, used in 1980, contained an optional agreement through which the purchaser could lease his container to Controlled Atmosphere Transportation Company (CATCO) for $2,700 per month. CATCO was formed by Dixon in 1980 when he temporarily lost effective control of FoodSource to co-founder Marshall Boyar. During the years in issue, all substantial functions associated with the leases were performed by FoodSource, not by CATCO. Each offering memorandum contained projections of the financial consequences of purchasing a container. Summaries of such projections in the initial 1980 memorandum and the final 1982 memorandum appear in Appendix B (Charts 1 and 2, respectively). In addition to the offering memoranda, FoodSource printed high quality color advertising brochures to stimulate container sales. Both the memoranda and the brochures stated that container purchasers would receive *174 generous tax benefits, including depreciation and investment tax credits. The advertising material also represented that the Nitrol system was a breakthrough in storage technology and that purchasers should realize large economic returns from the increased storage life of perishables. The material stated, for example, that produce could be stored in a Nitrol container upon harvest and then sold after the harvest season for substantial profit. According to the materials, the Nitrol containers could transport perishables long distances with condition upon arrival comparable to, but for a small fraction of the cost of, aircraft shipments. Through the CATCO leases or other arrangements with purchasers, FoodSource intended to operate a large fleet of containers for transcontinental and world-wide transport of perishables. During 1981 and 1982, FoodSource sent at least six newsletters to container owners that represented that FoodSource was making significant progress toward this goal. In July 1982, Juhn Thomson (Thomson) of Marshall and Stevens, Inc., prepared an appraisal of the container for FoodSource. Thomson concluded that the fair market value of a new Nitrol container was *175 $220,000 on March 1, 1982. Thomson reached this valuation after applying three different approaches to value the container. The first approach used by Thomson was what he termed the "cost" approach. Thomson relied on a survey by Townsend and Townsend, a patent law firm, of its clients indicating that patented products could reasonably sell for 5 to 10 times the cost to manufacture depending on the degree of technological breakthrough, the desirability and acceptance of the product, and the degree of monopoly on the technology. Under this approach Thomson concluded that $260,000 was a reasonable value for the Nitrol container because this value represented 8.38 times the total manufacturing cost (materials and labor) of approximately $31,000, and "although high," was within the range indicated by the Townsend and Townsend survey. The second method employed by Thomson was the "market" method. In applying this approach, Thomson first assumed that the Nitrol container would sell for at least as much per cubic foot of cargo capacity as the Grumman Dormavac container, the only other controlled atmosphere unit then "on the market," which sold at $127,000. Thomson ultimately determined *176 a value of $184,000 for the Nitrol container under this approach, which equaled the offering price of the Dormavac divided by its cubic footage times the cubic footage of the Nitrol container. The final method employed by Thomson was the "income" method. Here Thomson discounted the earnings projected over an assumed 20-year life of the container. Thomson computed the projected earnings as follows: We projected revenues based on FoodSource's recorded operating data, which indicated revenues from a low of $1,700 per month on the New Zealand operations to a high of $4,800 per month in domestic storage. The most consistent monthly income ranged between $2,500 to $3,000 per month. We have used $2,500 per month in year 1 of our projection to give some allowance for down time, since a container cannot reasonably be expected to have 100 percent utilization. Expenses consisted of insurance, maintenance, and management cost. * * * Manufacturing and Operating Problems
FoodSource engaged the Budd Company (Budd) to manufacture the containers.The original order was for 100 containers, but that was increased to 1,000 container boxes for delivery in 1981. Under the contract, Budd, *177 the largest domestic manufacturer of refrigerated containers, was obligated to install the refrigeration unit (manufactured by another company) in each completed container box. Budd was not, however, to make the piping and electrical connections or to evacuate and charge the unit. These operations required approximately 10 hours labor and were necessary for operation of the refrigeration unit. Moreover, the contract did not call for Budd to install the oxygen analyzer, which was necessary for operation of the controlled atmosphere system. The analyzer was not in Budd's possession but was to be installed in FoodSource's California facility because of "security" problems. Delivery terms were F.O.B. Budd's plant in Pennsylvania. Title to the container was to pass to FoodSource upon completion of each container box, regardless of when FoodSource took delivery. Risk of loss remained with Budd until tender of delivery to FoodSource. Budd completed most of the containers in 1981. Because of a dispute with FoodSource over payment, however, Budd refused to release possession of 658 completed containers to FoodSource. FoodSource nevertheless sold such containers to investors in connection *178 with its Nitrol program and represented to the purchasers that FoodSource or its representative had taken delivery of the containers on behalf of the purchasers. Interests in such containers retained in the possession of Budd were sold to test case petitioners Noonan, Brohmer, Graham, Baumann, Condiotti, Field, Keane, Hulsman, Hillendahl, McKee, and Todd. (Some of these petitioners also acquired interests in containers not so held by Budd.) On November 12, 1982, FoodSource sued Budd in the United States District Court for the Northern District of California, and Budd named the purchasers from FoodSource as cross-defendants in a cross-claim. The parties entered into a stipulated settlement on September 1, 1983, which included the following terms: (1) The purchasers from FoodSource owned the containers subject to a security interest of Budd in each container equal to a pro rata portion of the amount owed Budd by FoodSource (approximately $18,000 per container); (2) Budd must release this security interest in any container upon payment of such amount by the owner; and (3) Budd would lease or otherwise operate all containers upon which there remained an amount owing, and a portion *179 of container earnings would be used to repay such amount. Budd maintained records showing when release of each container occurred, and those records, and not FoodSource records or transfer documents, may be relied on in determining when each petitioner's container was actually delivered to FoodSource or to someone else on behalf of a petitioner. [4]
Although FoodSource operated most of the containers actually in service during 1981 and 1982, FoodSource experienced shortages of chassis, diesel generators, and operational nitrogen tanks during this period. Operations further suffered from an inadequate accounting system and insufficient qualified personnel. Due to the dimensions of the container box, FoodSource containers were not suitable for land transportation in certain foreign countries, and due in part to certain newspaper articles, *180 the containers acquired a negative image in the transportation industry. Because of these factors, the containers operated by FoodSource were idle 30 to 40 percent of 1981 and 1982. Moreover, leases to steamship companies for use as standard refrigerated containers (i.e., without controlled atmosphere) constituted the only substantial use of the containers during this period. Only infrequently was FoodSource able to lease containers for use in controlled atmosphere transportation. [5] Finally, several of the steamship companies experienced functional problems with the FoodSource containers, which further contributed to their image problem. Rental rates in the leases with the steamship companies typically were $15 to $22 per day, *181 which were normal rates for standard refrigerated containers. The leases provided that the lessees were liable for loss of the containers and typically stated: "The replacement value of containers * * * shall be U.S. $260,000.00 per container; but not to exceed $29,500.00 repair cost." The containers retained by Budd remained idle until the settlement date. After September 1, 1983, some of the container owners paid Budd the balance due and thereby gained possession of their containers. The vast majority, however, made no payment to Budd and allowed Budd to operate the containers. Budd leased the containers to steamship companies for use as standard (not controlled atmosphere) refrigerated containers at rates similar to those charged by FoodSource in the leases with steamship companies. FoodSource sent container owners periodic statements purporting to show revenues earned by and expenses associated with the containers that it operated. With respect to containers operated through CATCO leases, the statements reported lease payments, which in certain cases were less than the amounts provided for in the leases, and deducted insurance of $75 per month, maintenance of $340 per month, *182 and the applicable debt service to arrive at payments purportedly made to the owners during the period. Beginning at least as early as 1983, however, FoodSource adjusted either the lease payment or the debt service figures so that purported revenues exactly equaled purported expenses. With respect to the containers retained by Budd, the statements generated by FoodSource falsely reported revenues and expenses as if the containers were in operation, notwithstanding that Budd had not yet released the containers to FoodSource. During this period of idle storage, the quarterly statements contained explanations such as the following: "FoodSource Inc. rented your container * * * and will continue to do so until it first enters revenue service with an independent third-party user"; "The above quarterly figure represents the use of your container by FoodSource Inc."; and "The above revenues and/or expenses were allocated to you by FoodSource on account of your container while stored on the manufacturer's premises." In certain other instances, the statements similarly reported revenues with respect to containers that were not actually producing revenue. According to Dixon, these allocations, *183 which reduced the note balances owed FoodSource, were made where FoodSource contributed to the failure of the container to earn revenue. Although the periodic statements reported $340 per month maintenance expenses (per container) paid to Container Maintenance Company, Container Maintenance Company was never organized. Maintenance functions actually performed, if any, were performed by FoodSource. Through the time of trial in 1985, the only commercially successful application of controlled atmosphere technology was the stationery storage of apples and pears. This process used nonportable devices to generate inert gases and hence was not feasible for applications in transit. As of the years in issue, it was not reasonably likely that the Nitrol containers sold by FoodSource would generate earnings significantly higher than those of standard (without controlled atmosphere) refrigerated containers. During those years, the fair market value of a NitrolContainer was between $52,000 and $60,000. "Refinancing"
On December 21, 1983, after participating in the trial of Sutton v. Commissioner,84 T.C. 210 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986), *184 Dixon sent the following letter to container owners that he considered "delinquent" on their note payments: Last week I participated in a U.S. Tax Court trial in Florida, and witnessed first hand the government's inability to poke any holes in the valuation of NITROL trailers that were sold in 1977 for $275,000 each, as that valuation applied to the owners involved who considered their promissory notes to be true full-recourse obligations and made payments on themaccordingly.
We expect to obtain a similar result with your container valuation in Tax Court, provided that you also treat your note to FoodSource as a true obligation and keep it current. Please, therefore, send in the * * * [dollar amount] by December 31st that is necessary to show that your promissory note was paid up and current as of the close of the 1983 tax year. I would hate to see us lose a container valuation argument over a small point like this. On May 30, 1984, Dixon sent a container owner a letter, which stated in part: If you pay additional money into FoodSource * * *, it should do two things: 1) Make it almost impossible for the IRS, in front of the Tax Court judge, to maintain *185 that the tax basis of your FoodSource container for the year in which you purchased it is substantially less than its $260,000 value (for a whole container). 2) Provide extra money to be used by FoodSource * * * to pay for the work that has to be done between now and the Tax Court case, which should be in about two years, in order to defeat the IRS in their attempt to intimidate container buyers with false statements, improper threats, and totally unjustified harassment. In 1983 Dixon sent a number of container owners a letter that stated in part: You previously entered into a Purchase and Security Agreement with FoodSource * * * to purchase a patented container. Since the date of entering into that agreement, the Internal Revenue Service issued Revenue Ruling 82-224 on December 27, 1982, concerning a food storage container purchase. We have analyzed that ruling in conjunction with legal counsel. As a result, we are suggesting a course of action which we believe will strengthen your position in the face of the Revenue Ruling with respect to your claim of a tax basis of * * * [$260,000 times the percentage owned] for your container interest. Towards that end, *186 for your review and signature, we are enclosing a secured promissory note which will supersede that previously signed by you and delivered as part of the consideration for the purchase of your FoodSource container. We are proposing that the enclosed note merely be substituted for the previously executed one, as exhibit B to your previously signed Purchase and Security Agreement. * * * By signing and returning this letter and the enclosed secured promissory note as indicated immediately above, you are acknowledging that there has been fair and adequate consideration for the reexecution of the promissory note. This consideration consists of an overall reduction of your total obligations to FoodSource, a reduction in the monthly payments for the first twelve years and a cancellation of all amounts due under the note, in exchange for your agreement to assume this new liability. The accompanying note stated that FoodSource could demand payment of the entire unpaid balance (principal and interest) if the owner failed to pay any monthly installment within 6 months of its due date. FoodSource could not assign the note without prior written consent of the owner. FoodSource filed *187 a bankruptcy petition in 1984. In or about August 1985, FoodSource's trustee in bankruptcy sent a letter to container owners in default under the substitute notes, which declared the entire balances of the notes due and payable. Investor Activities
Few, if any, of the container investors other than the petitioners specifically discussed below conducted independent inquiries into the reasonableness of the projections used by FoodSource in its offering materials; the reasonableness of the purchase price; the feasibility of operating a fractional interest in the container; or the commercial viability of the FoodSource program. Few, if any, had experience in the trucking, shipping, or produce distribution industry, or other relevant business experience or consulted with anyone who had such experience. Few, if any, obtained appraisals; inspected a container; or entered into any separate agreements or engaged in any activity to ensure that the container was completely manufactured, paid for, delivered, and placed in operation. [6]
*188 Hillendahl
Petitioner Wesley H. Hillendahl (Hillendahl) was a consulting economist living in Hawaii when he first learned of the FoodSource Nitrol containers. He was Chief Economist at the Bank of Hawaii from 1966 through 1981 and possessed substantial knowledge of the economy and agriculture of Hawaii. Due to the remoteness of the State, Hillendahl believed that Havaiian agricultural products, particularly pineapple and papays, were particularly well-suited for shipment in Nitrol containers. He decided to invest in the containers after discounting the earnings stream that he believed the containers would generate in such usage. Hillendahl and co-petitioner Marilyn G. Hillendahl (the Hillendahls) purchased interests, varying from 25 percent to 80 percent, in three Nitrol containers through Purchase and Security Agreements dated December 8, 1980, June 15, 1981, and December 20, 1981. The Hillendahls signed (1) a nonrecourse note, (2) a recourse note allowing deferral of out-of-pocket payments during FoodSource's operation of the container, and (3) a recourse note providing that FoodSource could demand the balance due after sale of the container, in connection with the *189 purchase of the three interests, respectively. On June 20, 1981, the Hillendahls substituted a recourse note for the nonrecourse note used in connection with the December 8, 1980, purchase of the initial container interest. The recourse note had a principal balance equal to that of the nonrecourse note for which it substituted, but was virtually identical in form to the notes used in connection with the fourth offering by FoodSource. They signed the substitute note because Hillendahl believed, after a conversation with his tax advisor, that their basis for depreciation and investment tax credit purposes otherwise would be limited to their cash down payment. The Hillendahls entered into a lease with CATCO for the first container interest purchased. As was their option under the lease, they canceled the lease on August 1, 1981. The first two containers in which the Hillendahls purchased an interest were operated by FoodSource and were placed in service in 1981 and 1982, respectively. The third container was not; it was retained by Budd in connection with the dispute with FoodSource and remained in Budd's possession as of the time of trial. After the Hillendahls purchased *190 their interests in the containers, FoodSource engaged Hillendahl to research the market for Nitrol containers. His activities included writing numerous letters seeking both data and opportunities to employ the containers, particularly in shipping among Pacific Ocean nations. Todd
Petitioner Richard J. Todd (Todd) was president of three subsidiaries of Santa Fe International involved in various aspects of the transportation industry. Prior to purchasing any Nitrol containers, Todd conferred with several supermarket executives who were enthusiastic about the containers. Todd and co-petitioner Denese W. Todd (the Todds) purchased entire interests in two containers through Purchase and Security Agreements dated December 8, 1981, and a third through an agreement dated October 14, 1982. The terms with respect to each purchase were as prescribed in the seventh and eighth offering memoranda. The Todds subsequently executed three of the notes sent by Dixon in 1983 (with the cover letter referencing Rev. Rul. 82-224) in substitution of the notes initially executed in connection with the purchases. Each of the containers purchased by the Todds was involved in the *191 dispute with Budd and was retained by Budd until after settlement of that dispute. Todd learned of Budd's retention of the containers and questioned FoodSource repeatedly concerning their release. With respect to the first two containers purchased by the Todds, the periodic statements from FoodSource reported 1982 revenues of approximately $13,600 per container, an amount almost sufficient to cover debt service reported for the year. On November 29, 1983, the Todds paid Budd approximately $49,200 for release of their three containers. On December 19, 1983, the Todds contracted for FEX Leasing Corporation (FEX) to manage their containers. The Todds' containers were not placed in service during the years in issue in these cases. Activities engaged in by Todd subsequent to those years, therefore, have no bearing on our decision in these cases. Henricks
When petitioner James W. Henricks (Henricks) learned of the Nitrol containers offered by FoodSource in 1981, he was a retired commercial airline pilot. Henricks asked persons involved in various aspects of the food industry about the commercial viability of the containers. These persons told Henricks that the Nitrol process *192 could be profitable, if the container performed as represented in the offering materials. Henricks and co-petitioner Shirley Henricks (the Henricks) executed a Purchase and Security Agreement for an entire container on May 30, 1981. The payment terms were those prescribed in the fourth FoodSource offering memorandum. On January 1, 1983, the Henricks executed the substitute note sent by Dixon. Although in 1981 FoodSource took delivery of and placed in service the Henricks' container, Henricks was unable to determine the location or use of the container. Aware of the operational problems facing FoodSource and concerned that their container might be among those idled due to insufficient support equipment (chassis, etc.), Henricks persistently questioned Dixon and other FoodSource employees, both orally and in writing. Henricks received inaccurate and evasive answers from FoodSource through 1982. During this period, however, the periodic statements from FoodSource reported revenues of approximately $14,000 earned by the Henricks' container. On August 20, 1982, the Henricks paid $28,700 for a chassis, a diesel generator, and a nitrogen tank to be used with their container. They *193 subsequently leased the support equipment to FoodSource for such use for $400 per month. Sometime in 1983 Henricks was involved in founding FEX as a vehicle for exploitation of the Nitrol containers after the impending demise of FoodSource and arranged for FEX to manage the Henricks' container. In 1985, he joined a venture to develop a nitrogen generator based on research by Dr. George L. Staby, president of Perishables Research Organization and highly respected in post-harvest technology. At that time, Henricks believed that the Nitrol process was unnecessary for virtually all domestic shipments and that the nitrogen generator was essential for international transportation under controlled atmosphere. OPINION Each of the petitioners purchased an interest in a Nitrol controlled atmosphere container from FoodSource and claimed depreciation and investment tax credits on their respective Federal income tax returns reflecting the $260,000 price per container charged by FoodSource.These petitioners were chosen as test cases to resolve issues involving the container investment with respect to numerous other petitioners. As to each issue, petitioners must prove that respondent's determination *194 is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Rule 142(a), Tax Court Rules of Practice and Procedure. To the extent that expenses other than depreciation are in issue, petitioners have not established actual payments and have failed to satisfy their burden of proof. To establish their entitlement to investment tax credits and depreciation deductions, petitioners must establish that the property was placed in service during the taxable year, that the taxpayer had a profit objective in acquiring and holding the property, and that the taxpayer had a particular basis in the property for tax purposes. When Containers Held by Budd Were Placed in Service
Petitioners claim that the containers retained by Budd in connection with the dispute with FoodSource were subject to depreciation deductions and investment tax credit in the year that FoodSource transferred title to the container purchasers (i.e., in 1981 or 1982), notwithstanding that these containers remained in idle storage with Budd until at least September 1, 1983. Depreciation and *195 the investment credit are allowed in the year in which the qualifying property is placed in service by the taxpayer. Sections 38(a), 46(a)(1), 46(a)(2), 46(c)(1); sections 1.46-3(a)(1), 1.167(a)-10(b), 1.167(a)-11(e)(1)(i), Income Tax Regs. Property is placed in service when it is "placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Sections 1.46-3(d)(1)(ii) and 1.167(a)-11(e)(1)(i), Income Tax Regs. See also Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 745-748 (1985), on appeal (11th Cir., Dec. 23, 1985). In support of their argument that the containers were placed in service in the years claimed on their returns, petitioners rely upon Sears Oil Co. v. Commissioner,359 F.2d 191, 198 (2d Cir. 1966), revg. on this issue a Memorandum Opinion of this Court, and SMC Corp. v. United States, an unreported case ( E.D. Tenn. 1980, 46 AFTR2d 80-5827, 80-2 USTC par. 9642), affd. per curiam 675 F.2d 113 (6th Cir. 1982). In each of those cases operational *196 assets in the taxpayers' possession were found to be placed in service, even though circumstances beyond the taxpayers' control precluded their actually using the assets until the following year. See also Schrader v. Commissioner,582 F.2d 1374 (6th Cir. 1978), affg. a Memorandum Opinion of this Court. As the court stated in Sears Oil Co.: "[D]epreciation may be taken when depreciable property is available for use 'should the occasion arise,' even if the property is not in fact in use." 359 F.2d at 198. Similarly, in Waddell v. Commissioner,86 T.C. 848, 896-898 (1986), we concluded that property held for lease was placed in service in the year that the taxpayers "had the right to direct delivery of the * * * [property] (whether to themselves, to their distributors, or to their ultimate users)." Petitioners seize upon this language in Waddell and argue that the container owners here had the right to control the containers when they purchased them from FoodSource. According to petitioners, at that time they were the legal owners of the containers, free of any security interest of Budd, under the California Commercial Code. *197 Petitioners thus construe Waddell as implying that the taxpayer's acquiring mere title to the property is sufficient for the property to be placed in service. Petitioners have taken our statement in Waddell out of context and, in focusing solely upon legal title, attempt to exalt form over substance. The taxpayers in Waddell possessed the power as well as the right to direct delivery of the property (and actually exercised this power in the year in issue). Thus the property in Waddell was "placed in a condition or state of readiness andavailability."Sections 1.46-3(d)(1)(ii) and 1.167(a)-11(e)(1)(i), Income Tax Regs. (Emphasis supplied.) In the present case, by contrast, Budd's retention of the containers precluded petitioners from directing delivery of or otherwise exercising control over the containers before September 1, 1983. While the containers were in Budd's possession, petitioners couldnot hold them out for lease, to FoodSource or any other party. Whether petitioners had clear legal title to the containers and whether Budd's retention of them was unjustified are simply irrelevant to the issue. The present case is thus indistinguishable *198 from Cooper v. Commissioner,542 F.2d 599 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. In Cooper,undelivered property was found not placed in service in the year for which delivery initially was contracted, even though the taxpayer paid a substantial portion of the purchase price. Neither we nor the Court of Appeals discussed the legal rights of the taxpayer against the seller or whether the seller's refusal to tender delivery was wrongful. Petitioners attempt to distinguish Cooper by arguing that in Cooper the property was never delivered. The crux of Cooper, however, was that delivery was not made, and hence the property was not availableforuse, by the end of the years in issue. See 542 F.2d at 601. Indeed, it is quite possible that the taxpayer in Cooper received the property after the date of trial. Arguing that the containers were available for use by petitioners "should the occasion arise," petitioners imply that Budd would have allowed them to take possession in the years of purchase. This implication is not supported by any evidence in the record and is negated by the unambiguous and *199 uncontradicted testimony of Carl H. Wheeler, the Budd executive in charge of the FoodSource order. Moreover, it is inconsistent with FoodSource's claims in the lawsuit against Budd. Our holding herein is supported by the reasoning of the Court in Sears Oil Co. v. Commissioner,supra, that depreciation deductions were proper with respect to the period between the taxpayer's receipt of the asset and its first use "to reflect the gradual deterioration of the completed asset that was taking place during this period." 359 F.2d at 198. See also Cooper v. Commissioner,542 F.2d at 601 (quoting Massey Motors, Inc. v. United States,364 U.S. 92 (1960)). In the present case, risk of loss with respect to the containers remained with Budd until Budd tendered delivery to FoodSource. Similarly if, as petitioners argue, Budd's retention of the containers was wrongful, Budd presumably would be liable to petitioners for any decline in value of the containers during the period of retention. In addition, while the containers were stored by Budd, they were not in a condition or state of readiness for their "specifically assigned *200 function." Sections 1.46-3(d)(1)(ii) and 1.167(a)-11(e)(1)(i), Income Tax Regs. The function of the containers was refrigerated controlled atmosphere transportation. There is no evidence that Budd made the piping and electrical connections necessary for operation of the refrigeration units before it began operating the containers in accordance with the 1983 settlement, and Budd never even possessed the oxygen analyzers necessary for controlled atmosphere operation. Petitioners argue that completion of the containers required minimal work and that the containers couldhavebeenused to haul nonperishable cargo when Budd completed manufacture. Petitioners' argument would be more persuasive if the containers were actually completed or so used. It is meritless here in the context of mere potential use. Tax consequences are determined on the basis of what happened in fact, not what might have happened. We thus conclude that the containers were placed in service when released by Budd, which, in the case of the containers involved in the dispute, was no earlier than September 1, 1983. For example, none of the container interests acquired by the Todds or certain *201 other test case petitioners identified in our findings were placed in service during the years in issue, and they are not entitled to investment tax credits or depreciation in those years. We do not have in the record adequate evidence for determining carrybacks, if any, that they may claim from subsequent years. Budd's records, Exhibit DF, establish the earliest date on which a container was released and thus placed in service, and those records should be the source of determinations on a case-by-case basis. To the extent that petitioners claimed investment tax credits or depreciation prior to that time, in years in issue in these cases, the credits and deductions cannot be allowed. Profit Objective
To qualify for depreciation and other expense deductions with respect to the containers, each petitioner must demonstrate that his or her container was used in a trade or business or was held for the production of income. Sections 162, 167, and 212.[7] Under section 48(a)(1), the investment tax credit is allowable only for property for which depreciation (or amortization in lieu thereof) is allowable. Thus, petitioners' respective rights to the deductions and investment credit *202 depend on their showing that the activity constituted a trade or business or was undertaken and carried on for the production of income. See, e.g., Beck v. Commissioner,85 T.C. 557, 569 (1985). Essential to such a showing is a demonstration by each petitioner that he or she had "an actual and honest objective of making a profit." Beck v. Commissioner,supra;Estate of Baron v. Commissioner,83 T.C. 542, 553 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir 1983). A reasonable expectation of making a profit is not required; however, petitioners' objective of making a profit must be bona fide. Beck v. Commissioner,supra;Estate of Baron v. Commissioner,supra;Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), *203 affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Krasta v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984). In this context, "profit" means economic profit, independent of tax savings. Beck v. Commissioner,supra, and cases cited therein. If the activity is not engaged in for profit, the deduction of petitioners' expenses relating to the activity is allowable only to the extent provided in section 183(b). Whether petitioners possessed the requisite profit motive is a question of fact to be determined on the basis of all the facts and circumstances.[8]Beck v. Commissioner,85 T.C. at 570; Estate of Baron v. Commissioner,supra. No one factor is determinative; however, greater weight will *204 be given to objective facts than to petitioners' statements of intent. Beck v. Commissioner,supra;section 1.183-2, Income Tax Regs.
On the record it appears that most of the FoodSource investors did very little that would convince us that *205 they had an actual and honest profit objective under the tests enunciated in the above cases and specifically applied to comparable property in Sutton v. Commissioner,84 T.C. 210, 222-226 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986). In view of their special backgrounds and specific activities in relation to the containers, however, we conclude that petitioners Henricks and Hillendahl have demonstrated that they possessed an actual and honest profit objective with respect to their container interests. Both petitioners consulted parties knowledgeable in the food industry prior to purchasing their respective interests. Henricks repeatedly questioned FoodSource regarding the use of and accounting for his container, and he expended substantial effort and money in attempting to profitably employ his containers. We do not think that such expenditures were undertaken merely to secure the large tax benefits claimed on their returns, as was the case with the taxpayers in Sutton v. Commissioner,84 T.C. at 225-226. We also conclude that execution of the substitute notes in 1983, which subjected petitioners to greater personal liability *206 than the original notes, is not fatal to Henrick's claim of profit motive. Unlike the substitute note executed by Hillendahl in 1981, the 1983 note required lower initial payments than its predecessors. Moreover, even if execution of the substitute notes was motivated solely by tax considerations, as Hillendahl admitted was true with respect to his substitution, in the context of Henrick's entire course of action we conclude that his desire to maximize tax benefits was ancillary to his desire for economic profit. See Waddell v. Commissioner,86 T.C. 848, 894 (1986). Although Hillendahl presents a closer case, we conclude that he too was motivated by economic profit apart from tax benefits. Like Henricks, Hillendahl did not blindly rely upon the attractive economic projections in the offering material; he undertook his own discounted cash flow analysis. Through his knowledge of the Hawaiian economy and agriculture, Hillendahl discovered what he believed was a nuique opportunity profitably to employ the containers. He similarly continued attempting to open new markets for the containers after their acquisition. In this case, as contrasted to many of the so-called *207 "tax shelter" cases in which we have determined that investors did not have an actual and honest profit objective, the subject property was actually produced and the plan of operation had some commercial potential. As discussed below, the terms agreed to by the parties reflected "financial fantasies" (see Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983)), and were designed to engender tax benefits to which they were not entitled. As we said in Beck v. Commissioner,supra:
it is apparent that bona fide business enterprises * * * may find a sideline of marketing tax benefits to provide a useful means of raising venture capital. To some extent tax incentives, such as accelerated depreciation and investment tax credit, are designed to stimulate the formation of venture capital. Such incentives are not intended, however, to create a new economy consisting of paper transactions having no relationship to the real value of goods and services. Thus, the mere presence of a valid business enterprise at some levels of a transaction does not automatically entitle passive investors distant from day-to-day *208 operations of the enterprise to the associated tax benefits. * * * [85 T.C. at 579-580.] At the same time, it is thus not surprising that some active investors, who have demonstrated an intention to achieve a profit from the underlying activity, will be entitled to the deductions and credits claimed. The manufacture of the FoodSource containers and their use in commerce were the types of activities that tax incentives were intended to encourage. Under these circumstances, some taxpayers are entitled to realize those incentives. See, e.g., Leahy v. Commissioner, 87 T.C.     (July 3, 1986) (at 25 of slip opinion), in which we said: As important, we should not disregard the existence of an asset for which Congress intended tax advantages merely because the parties attempted to maximize the advantage of those benefits for one of the parties to a transaction. Respondent should recognize that in instances where there are no shams and depreciable assets exist, some person or entity is entitled to the intended tax advantages. [17] See Estate of Thomas v. Commissioner,84 T.C. 412, 433-440 (1985).* * * This does not mean, of course, that *209 we cannot separate the real and the unreal aspects of the transactions to adjust the tax benefits to reality and deter abuse. See Tolwinsky v. Commissioner,86 T.C. 1009, 1062 (1986). In the context of these cases, the reality is that for over 15 years Dixon worked on an invention without commercial success. Only when he redirected his activities at the tax shelter market did he generate substantial revenues. Although it is not surprising that the FoodSource program was a commercial failure, it was not so improbable as to negate any profit objective in any taxpayer. With respect to Henricks and Hillendahl, we conclude that they have satisfied the initial inquiry into profit objective, and that we must, therefore, determine their adjusted basis for purposes of investment tax credit and depreciation deductions. Petitioners' Basis in the Containers
In this case, the primary question concerning basis is whether the notes given to FoodSource by petitioners constituted valid indebtedness. Although basis for purposes of depreciation *210 and the investment tax credit normally includes valid purchase money debt, a liability is not includable in basis unless its repayment is reasonably certain. In this context, as in others, the substance of an alleged debt, and not its form, determines the tax consequences, and illusory debt will be disregarded. See Waddell v. Commissioner,86 T.C. 848, 898-903 (1986), and cases cited therein.[9]
With the exception of the initial FoodSource offerings, notes used by FoodSource were labeled "recourse" and purported to subject the debtor to some form of personal liability, i.e., liability for repayment without regard to the value of or earnings generated by the containers. On the entire record, however, we are not convinced that the parties intended that the notes in fact be recourse or that, in any event, repayment of the notes was likely. Comparing the face value of the notes with the revenues *211 reasonably to be expected from operations of the containers (as contrasted to the unrealistic projections in the FoodSource promotional materials), we conclude that it was highly unlikely that the notes would be repaid from funds generated by the containers. As appears more fully below in our discussion of fair market value, the parties could not have realistically believed that the containers could be sold to make substantial payments on the notes. We are unpersuaded that petitioners intended to pay the notes out of separate assets, as is required to find that they had "personal liability," or that FoodSource intended to enforce the notes according to their terms. The overwhelming weight of the evidence is that the terms of purchase of a container were designed only to maximize purported tax benefits associated with owning a container. Dixon's communications to the investors and his testimony at trial, as well as the testimony of Todd, Henricks, and Hillendahl, are substantial support for this generalization. Other testimony is to the same effect. For example, Gerri Habermeyer testified that in June 1980, as proprietor of Executive Financial Services, she became a sales representative *212 for FoodSource and that, over the next 3 years, she sold in excess of 1,400 interests in FoodSource containers. When she was asked about the terms of the note relating to her purchase of a container, she testified as follows: A I signed a recourse note. Q A recourse note in 1980? A Well, I requested a recourse note. Q And when did you request that? A At the time I made my purchase. * * * Q And you say you requested a recourse note; was the note which you offered to your investors in 1980, or the note which FoodSource offered to its investors in 1980, a nonrecourse note? A Yes, it was. Q And when did you request that a recourse note be given to you? A I don't recall the date, but at the time I made my purchase, I signed the package; it contained a nonrecourse note. And I don't recall whether I signed the nonrecourse and sent it in and asked for a recourse, or whether I did not sign it and asked that a recourse note be sent to me right away. * * * Q Aside from the credits which you have received from CATCO, have you made any payments on this note? A No, because it's paying for itself. Q The note pays for itself? A The lease payments. Q From CATCO pay for *213 itself? A Yes. Q And why did you insist upon a recourse note for 1980? A Well, I felt that I could handle the risk of a recourse note, plus the fact that it did have better tax advantages. Q Better tax advantages than a nonrecourse note? A Yes. Q Did you advise your clients, who purchased interest from you in 1980, to sign a recourse note as opposed to a non-recourse note? A No, I did not. Q Did you distinguish in any way the income tax benefits that are available to them from those which are represented in the prospectus? A I don't recall that anyone was interested in a recourse note, and the subject was never brought up. I think the only reason that I had a recourse note is that I personally talked to Mr. Dixon and asked him if I could have a recourse note. I don't think it was a form that was available. I don't know but I just felt that -- Habermeyer went on to state that on the tax returns she prepared for her clients who purchased container interests, investment tax credits and depreciation were claimed on the basis of a $260,000 purchase price for each container, regardless of whether the notes were recourse or nonrecourse in 1980. She testified: *214 Q My question is, when you advised your clients whether or not to invest in a FoodSource container in 1980, did you attempt to distinguish for them the tax benefits available, using a recourse note, versus a nonrecourse note? A I never even mentioned a recourse note to them, because it was not available to them. So, there was no point in bringing it up. The only reasonable inference from this testimony by a person actively involved in the FoodSource sales program and purporting to be sophisticated in tax matters was that she knew that her tax position would be improved if she signed a note recourse in form, although her transaction was otherwise apparently identical to those of her numerous investor-clients. It defies reason to believe that under these circumstances petitioners had a nontax motive for choosing a recourse note over a nonrecourse note, or that the notes should be respected because they were recourse in form. Shortly after the 1980 transactions, all of the FoodSource offerings changed the terms to require "recourse notes." There is neither evidence nor reason to believe that the value of a container changed during this time or that FoodSource intended to increase *215 the purchase price. If the recourse notes represented true indebtedness, however, their use would represent a substantial increase in the value of the consideration required to purchase a container. Indeed, the same can be said about the various forms of recourse notes used. Each successive version purported to subject the debtor to successively greater personal liability, particularly considering the time value of money and the ability of the debtor to defer out-of-pocket payments for 20 years under the initial recourse notes. The changes in the note terms thus appear to be an attempt to stay "one step ahead" of the Internal Revenue Service and to secure tax benefits at the expense of minimum personal liability. Any doubts in this regard are dispelled by the various letters sent by Dixon, including the proposal of the substitute note in 1983 after the Internal Revenue Service issued Rev. Rul. 82-224, 1982-2 C.B. 5. Regardless of the purpose of the purported recourse notes and the various forms that they took, the only reliable inference from the record is that there was no actual intention by any party to respect the terms of the notes. In the periodic statements *216 to container owners, FoodSource often assigned revenues to containers that were not even in operation. It thereby reduced the balances "owed" on the notes, although the owners made no payment on the notes, through container earnings or otherwise. In the face of such practices, statements such as those made by Todd and Habermeyer that they made periodic payments on and were "current" with respect to all substituted notes any by Henricks that he always intended to repay his debts possess little significance. [10] We seriously doubt, and in any event the record does not suggest, that the recipients of the fictitious credits would object to FoodSource's reducing the balances of their notes. Although the record indicates that some purchasers made cash payments on their notes beginning in 1983, it also indicates that virtually none made all payments "required" under the notes. Yet there exists no *217 evidence that FoodSource ever attempted to enforce any of the notes according to their terms, even the 1983 substitute notes, which provided that FoodSource could declare the entire balances payable immediately if the debtor was in default. Indeed, the very structure of the other "recourse" notes made it unlikely that FoodSource would exploit the personal liability of the debtors. The initial recourse notes allowed deferral of payment for 20 years, and the subsequent notes required FoodSource first to sell the container. We wonder how, under the latter requirement, FoodSource would have proceeded against a delinquent owner of a partial interest in a container if the other owners were not in default. The only evidence in the record of FoodSource even requesting payments on the notes are the letters from Dixon purporting to help the debtor secure claimed tax benefits. In light of this objective openly declared by Dixon, [11] we conclude that payments made significantly after the years in issue are not persuasive evidence of a valid obligation as of those years. Cf. Sutton v. Commissioner,84 T.C. 210 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986). *218 Letters sent by the trustee of FoodSource's bankruptcy estate are similarly entitled to little weight, especially in view of the potential for cross-claims and defenses by the investors. Both the last note offered in connection with container sales and the 1983 substitute note, by their terms the "most" recourse of the notes used, precluded FoodSource from assignment without the debtor's written consent. FoodSource thus attempted to ensure that another party could not enforce what on its face appeared to be a legal obligation, although FoodSource had not treated it as such. We thus conclude that payment on none of the notes was sufficiently certain as of the years in issue to *219 justify their treatment as valid debt for tax purposes. Cf. Coleman v. Commissioner, 87 T.C.     (July 23, 1986); Law v. Commissioner,86 T.C. 1065 (1986); Tolwinsky v. Commissioner,86 T.C. 1009 (1986). [12]
Petitioners contend that, if we hold that the notes are not includable in basis, they are entitled to deductions when they make actual payments on the notes. According to petitioners, "[S]uch payments are more properly characterized as either management fees or as payments made pursuant to the Improvements in Production clause under the Purchase and Security Agreements." Nothing indicates, however, that petitioners were obligated to pay management fees to FoodSource and, as we conclude infra, the Improvements in Production clause possessed little or no value. Petitioners have not demonstrated that they acquired any assets possessing substantial value other than the containers. Compare Lemmen v. Commissioner,77 T.C. 1326, 1350-1351 (1981). Any payments on the notes during the years in issue therefore increase petitioners' bases in the *220 containers, to the extent of their fair market value. See section 1.46-3(d)(4)(ii), Income Tax Regs. (allowing an increase in the investment tax credit in the year the taxpayer makes payment). Cf. Seligman v. Commissioner,84 T.C. 191, 200-203 (1985), affd. 796 F.2d 116 (5th Cir. 1986). On the record before us, it is likely that any cash payments in excess of fair market value of the containers are nondeductible payments for the anticipated substantial tax benefits projected in the offering memoranda. See Bryant v. Commissioner,790 F.2d 1463 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Rice's Toyota World v. Commissioner,81 T.C. 184, 210 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985); Grodt & McKay Realty v. Commissioner,77 T.C. 1221, 1243 (1981). [13]
*221 Petitioners argue that they are entitled to have the transaction respected and the notes included in basis because the FoodSource container had a value of $220,000, as testified to by Thomson, or somewhere near that. This valuation is based on the claim that the container is "unique" and "state-of-the-art technology." We are totally unpersuaded by these claims for a variety of reasons. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all relevant facts. Cartwright v. United States,411 U.S. 546, 551 (1973). Before examining the conclusions of the expert witnesses who testified and whose valuation reports were received in evidence, several general observations concerning the containers are appropriate. First, Dixon testified that the Nitrol container involved used a completely different technology and was much more valuable than the trailers sold by Nitrol Corporation, which were the subject of Sutton v. Commissioner,84 T.C. at 225-226. Dixon repeatedly attempted to minimize his involvement *222 in Nitrol Corporation by saying, for example, that the corporation did not follow his design in making the trailers. Based upon Dixon's letter of December 21, 1983, and our findings of fact in Sutton, however, we think that Dixon's involvement therein was not so minimal. More importantly, the Oxytrol patents do not specify the precise means of maintaining a controlled atmosphere. The 477 patent used by Nitrol Corporation, which Dixon now disparages, was granted after the Oxytrol patents and provided for a specific means of maintaining controlled atmosphere. Indeed, statements in Dixon's application for the 477 patent and in the FoodSource offering materials implied that the 477 patent was at least as viable as, if not superior to, the unmixed nitrogen method of controlling atmosphere used by FoodSource. Second, various witnesses, including petitioners' experts, mentioned the Dormavac container marketed by Grumman Corporation (Grumman) as the only "competitor" to the Nitrol container. Grumman offered the Dormavac for sale for approximately $120,000, but as indicated in a report prepared by Dr. George L. Staby, witness for petitioners, Grumman made only two sales of the Dormavac *223 before abandoning it after eight years of sales efforts. Although several witnesses testified that the Nitrol container was "superior" to the Dormavac, any attempts to extrapolate the value of the Nitrol container from the price charged for the Dormavac would be unreliable. Third, as is illustrated by the testimony regarding the Dormavac, petitioners' experts were unable to demonstrate the commercialviability of the Nitrol container. Petitioners called respected experts such as Robert McKee and Russell H. Hinds, who extolled the technical virtues of the container and the controlled atmosphere process that it employed. Petitioners' experts did not demonstrate, however, that it was reasonably likely that the containers would generate earnings remotely justifying the $260,000 asserted value. The record, including the experience of Senter and FoodSource as well as the frank testimony of Henricks and Todd, indicates that controlled atmosphere is not necessary, and certainly not cost effective, for use in domestic transport. Petitioners contend that the poor earnings record of the FoodSource containers, i.e., no greater revenues than conventional refrigerated containers, was *224 caused by unforeseen operational problems at FoodSource. Yet after Todd and Henricks began operating their containers through FEX, they too were unable to command the higher revenues initially forecast by FoodSource and necessary to satisfy the notes used in purchasing the containers. Like Todd and Henricks, we must conclude that the only prospect for "premium" earnings lay in international shipments. Yet according to both Henrick's and Todd's testimony, successful use of the process internationally required development of a nitrogen generator. Nothing in the record indicates that such development was commercially feasible as of the years in issue. Fourth, the record indicates that it was not economically feasible to use the Nitrol container as a storage facility. The Nitrol container as sold by FoodSource did not include basic support equipment virtually essential for operation with or without controlled atmosphere. In light of all of these factors, as of the years in issue, it was unlikely that the containers would generate earnings significantly exceeding those for standard containers. Needless to say, in cases such as this, the price established by the seller has little, *225 if any, probative value. When asked how he arrived at the price, Dixon testified: A I took a look at what the technology could do from my experience in the fresh fruit and vegetable business itself, and, which was quite extensive in international shipping of fresh fruits and vegetables. Knowing what difference there was in market price of the product if it arrived in good condition from California to Paris or California to Hong Kong versus what it would bring if it did not arrive in good condition, knowing what it would cost to fly these products versus sending them by ship, I figured that these boxes could make a certain number of dollars per month for any owner. I capitalized a portion of those earnings in front, like you do with any patented, high technology equipment, and arrived at a -- what I felt was a reasonable sale price of approximately $500,000.00. Q And the -- the price ultimately charged to the container purchaser was what amount? A $260,000.00. Q And why did you sell for less than the $500,000.00? A I didn't want to meet that much price resistance in the market. I thought -- even though I felt it was my only chance to -- to capitalize on the patented technology, *226 a -- I thought the additional profits probably at that point belonged to the owners. For the reasons mentioned above, however, we have little confidence in Dixon's assumptions as to the potential earnings of a single container, and there is no evidence of a market in fact for 1,000 containers in the use assumed by Dixon. Senter had been unsuccessful in its attempts to sell hardware for 40 or 50 units, and Nitrol Corporation had anticipated only 100 trailers. FoodSource originally ordered 100 containers. Its order was later increased to 1,000, apparently in response to sales of investments and without regard to actual use for the containers. Cf. Skripak v. Commissioner,84 T.C. 285, 325 (1985). Looking at the situation without the benefit of hindsight, which in fairness we should do, we are still left with no reason to believe the predictions made by Dixon, which were contradicted by his prior experience with the patent, the experience of Nitrol Corporation, and the experience of Grumman. Thomson's report adds almost nothing to the valuation process to the extent that he purported to use a cost approach and a multiple. His report states: Townsend and *227 Townsend, a well known patent attorney firm, conducted a survey of their clients which indicated that patented products could reasonably sell at prices five to ten times the cost to manufacture, depending on the degree of technological breakthrough, the desirability and acceptance of the product and the degree of monopoly on the technology. Some products, such as drugs, often sell at prices more than ten times the cost to manufacture them. Other patented products, such as an ammonia purification process, may sell at a price well below five times the cost to manufacture them. For example Xerox copiers initially sold at a price eleven times the cost to manufacture. This multiple decreased gradually as competitive brands were marketed. Today, certain Xerox copiers sell at prices approximately six to seven times the cost to manufacture even though the basic patents have expired. The multiple above the cost to manfacture indicated by the selling price of the FoodSource nitrol controlled atmosphere intermodal container is calculated below: $260,000 (Selling Price) / $31,000 (Cost to Manufacture) = 8.38 Although high, this multiple is within the range indicated by the Townsend and *228 Townsend survey. Therefore considering that two containers sold for all cash and the aforementioned factors, it is our opinion that the fair market value of the patented container, according to the cost approach is $260,000. It is hard to imagine more circular reasoning. The weakness in this method was not improved when an attorney from Townsend and Townsend testified with respect to various legal aspects of the patent but offered no information or opinion as to the use of multiples in valuing patented products. There is no evidence as to how the mere process of patenting the product adds to value regardless of the use or income potential of the product. Townsend's assumptions ignore worthless patented products and those that can recover a multiple of their cost only after achieving a volume of sales sufficient to achieve economies of scale. In addition, when he determined cost, Thomson assumed that the total product was eligible for a patent multiple, whereas neither the containers themselves nor their design were patented; only the process used was patented. [14]
*229 Thomson's "market" approach was based exclusively upon the asking price for the Dormavac, which he stated was $127,000. As previously indicated, we do not think that such price, which was never accepted in the market, is a reasonable basis for determining the value of the Nitrol container. Finally, Thomson's "income" approach utilized projected revenues that were unsupported and contradicted by the balance of the evidence in the record. Even if the containers on a few isolated occasions generated the revenues relied upon by Thomson, such levels were never sustained during the years in i ssue nor were they reasonably likely to occur consistently. Moreover, the record indicates that such premium revenues could conceivably be achieved only through international shipments, which the record indicates entailed both substantial shipping charges and the development of a nitrogen generator. Thomson's projections contained no provisions for these expenditures. Although his income approach purported to take account of expenses, and Thomson emphasized the importance of marketing and making a commercial success of the FoodSource containers, Thomson allowed nothing for marketing expenses. *230 [15] Although his report was dated in 1982, it contained no reference to the actual problems of FoodSource encountered in 1981. Using exaggerated income assumptions of $2,500 per month per container in the first year, growing by a compound rate of 3 percent per year, Thomson computed a value of only $184,000 for the container, which was the equivalent of his market approach. In reaching the value of $220,000, he gave the greatest weight to the cost approach that, as indicated above, merely incorporated the sales price. At trial Thomson implied that the difference between the $260,000 charged by FoodSource and the $220,000 value that he determined for the container might be attributable to the value of the obligation of FoodSource to make improvements available to container owners without charge. While petitioners similarly argue on brief, there exists no reliable *231 evidence in the record that this obligation possessed any value. For the above reasons, we find Thomson's appraisal unreasonable and not reflective of the value of the Nitrol container. Bruce E. Kann (Kann) was respondent's primary valuation expert at trial. Kann concluded that the value of a new Nitrol container was its replacement cost, which Kann determined to be $37,000. Kann based this figure on cost data that he received from Budd.Kann concluded that under the income approach to value, the value of the Nitrol container would be no greater than that of a standard refrigerated container, which was less than $37,000. On cross-examination, Kann acknowledged that a 50 percent profit margin in connection with the sale of the FoodSource container would be reasonable. Kann's determination of replacement cost appears reasonable, in light of the $31,000 manufacturing cost used by Thomson and the costs paid by FoodSource for the container box, the refrigeration unit, and the oxygen analyzer. Moreover, we have concluded that, as of the years in issue, the potential of the containers to generate earnings significantly exceeding those of standard containers was extremely speculative. *232 Respondent's other valuation expert, William P. Sablan, was an engineer employed by the Internal Revenue Service. Sablan inquired into the patents and the Dormavac container. He too concluded that he could not make a determination of value based on the income approach unless it was based on the revenues of a standard container. Thus calculations made under the income approach would approximate the cost or replacement value of a standard container, i.e., one that would rent at $22 per day of actual use. That rate was approximately 25 percent of the income assumed by Thomson. We are persuaded that the methods used by respondent's appraisers are much more reliable than those of petitioners', and that the actual fair market value is by far closer to respondent's valuation than petitioners'. Nonetheless we believe that the Nitrol container possessed some premium or speculative value reflecting the possibility (however remote) for premium revenues based on the FoodSource program -- at least at the time that the containers were sold to petitioners. Using our best judgment on the entire record, we conclude that the fair market value of the Nitrol container was not less than the highest *233 cash down payment required, $52,000, but not more than $60,000 during the years in issue. Additions to Tax
Respondent determined additions to tax under section 6659 with respect to most, if not all, of petitioners. In the years in issue, section 6659 provided in pertinent part: (a) Addition to the Tax. -- If -- (1) an individual, or (2) a closely held corporation or a personal service corporation, has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable. (b) Applicable Percentage Defined. -- For purposes of subsection (a), the applicable percentage shall be determined under the following table: If the valuation claimed is the
The applicable
following percent of the correct
percentage is: valuation --
150 percent or more but not more than 200 percent
10
More than 200 percent but not more than 250 percent
20
More than 250 percent
30
(c) Valuation Overstatement Defined. -- (1) In general. -- For purposes of this section, there is a valuation overstatement *234 if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). * * * (d) Underpayment Must Be at Least $1,000. -- This section shall not apply if the underpayment for the taxable year attributable to valuation overstatements is less than $1,000. (e) Authority to Waive. -- The Secretary may waive all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith. Petitioners argue generally that respondent was unreasonable in refusing to waive the additions to tax in this case because petitioners had a reasonable basis for the amount claimed on their return, to wit, investment tax credits and deductions based on a sales price of $260,000 per container. The parties assume that the Commissioner's refusal to waive the addition to tax could be reviewed by the Court for abuse of discretion. No petitioner has shown that he or she relied on anything other than the *235 FoodSource promotional materials in using $260,000, or a pro rata portion of that amount, as basis on a subject tax return, and we have discussed at length our reasons for concluding that the values and projected earnings in those materials have no basis in reality. Under these circumstances, we reject the argument that refusal to waive the additions to tax is an abuse of discretion. Certain of the petitioners, including the test case petitioners identified in our findings, will have their investment tax credits and depreciation deductions disallowed during the years in issue because the containers in which they invested were detained by Budd and not placed in service during the years in issue. Other petitioners may or may not have their deductions disallowed upon application of section 183 after further hearings. With respect to petitioners Henricks and Hillendahl, however, their respective claimed investment tax credits and depreciation deductions will be reduced in accordance with our finding that their adjusted basis for purposes of the investment tax credit must be reduced by the amounts of the notes and, to the extent represented by cash, limited to the maximum fair market *236 value of the container interest. Once those adjustments to basis have been made in the individual cases, the additions to tax under section 6659(a), presumably in the amount of 30 percent under section 6659(b), will apply to the portion of the underpayment of each petitioner attributable to the difference between the adjusted basis claimed on the petitioner's return and the amount determined to be the correct adjusted basis. See section 6659(c)(1). Respondent further claims additional interest under section 6621(d). Once the amount of an underpayment to which section 6659 applies has been calculated, that amount will be subject to interest after December 31, 1984, at the rate of 120 percent of the normal rate applicable to deficiencies. Section 6621(d)(1), (2), and (3)(A)(i). [16]
*237 On the present record, we have not determined all of the issues that may exist with respect to any petitioner, and therefore we do not express an opinion on whether section 6659 or section 6621(d) applies to any underpayments other than those resulting from reduction of basis for petitioners Henricks and Hillendahl. The parties have also made arguments concerning additions to tax under section 6661, but the evidence does not disclose the assertion of such addition with respect to any petitioner whose liability can otherwise be determined on the present record. We decline to discuss the application of a technical provision of the statutes in the abstract. Finally, various arguments have been raised by the parties in a series of briefs. Some were raised in reply to an adverse party's arguments in an earlier brief. We have considered all of the arguments but have not discussed in this opinion those that are unpersuasive, unnecessary to our decision, or not timely raised. Appropriate orders will be entered.
APPENDIX A Additions to Tax
Docket
Sec.
Sec.
Sec.
No.
Year
Deficiency
6651(a)
6653(a)(1)
6653(a)(2)
Donal C. and Ruth H. Noonan
16879-83
1979
$22,916.00
1980
28,694.00
1981
12,016.00
Martha Peterson
31318-84
1981
$ 4,037.00
$ 201.85
[1]
Laurence R. Clarke
34490-84
1980
$35,457.00
$1,773.00
1981
9,772.00
489.00
[2]
Paul O. Brohmer
126-85
1978
$ 5,848.45
$ 292.42
1979
5,221.22
261.06
1980
1,286.22
64.31
1981
6,292.00
314.60
[1]
William I. and Glenna F. Graham
126-85
1983
$20,748.00
$1,620.57
Jean A. Baumann
6123-85
1982
$ 2,202.00
$246.60
$ 126.15
[3]
David K. and Peggy S. Hughes
8339-85
1981
$ 4,415.00
$ 220.75
[4]
Paul R. and Phyllis J. Douglass
10859-85
1979
$12,563.00
$ 628.00
1982
32,116.00
1,606.00
[1]
Mearl W. and Verna J. Chapman
12358-85
1977
$ 9,310.00
$ 465.50
1978
10,995.00
549.75
1979
7,657.30
382.87
1980
11,785.07
589.25
1981
11,659.00
582.95
[1]
Edward and Joan Condiotti
12358-85
1978
$ 7,320.00
$ 366.00
1979
22,773.00
1,138.65
1981
3,155.00
157.75
[1]
James M. and Betty J. Field
13473-85
1978
$ 8,154.00
$ 407.70
1979
8,214.44
410.72
1980
1,293.00
64.65
1981
5,294.00
264.70
[1]
1982
14,435.80
721.79
[1]
Glenn D. and Nancy R. Johnson
13473-85
1981
$ 5,183.00
$ 259.15
[5]
Virginia G. Keane
15725-85
1978
$ 2,265.00
$ 113.25
1981
5,941.00
297.05
[6]
Norbert A. and Virginia P. Hulsman
18606-85
1978
$ 3,633.32
$ 181.67
1979
8,313.76
415.69
1980
10,495.55
524.78
1981
64,060.86
3,203.04
[1]
Wesley H. and Marilyn G. Hillendahl
24858-85
1978
$10,342.00
$ 517.00
1979
12,174.00
609.00
1981
44,648.00
$7,262.80
2,303.00
[7]
1982
12,015.00
600.75
[8]
1983
12,475.00
623.75
[9]
Robert and Loriel McKee
35031-85
1978
$ 7,624.00
$ 381.00
1981
2,302.00
115.00
[1]
1982
2,714.00
136.00
[1]
James W. and Shirley Henricks
4957-86
1982
$41,981.00
Richard J. and Denese W. Todd
8227-86
1979
$ 9,925.00
$ 496.00
1980
11,881.00
594.00
1981
92,255.00
4,613.00
[10]
1982
8,615.00
431.00
[11]
*238 Additions to Tax
Docket
Sec.
Sec.
Sec.
Residence When
No.
Year
6621(d)
6659
6661
Petition Filed
Donal C. and Ruth H. Noonan
16879-83
1979
Laguna Niguel,
1980
California
1981
Martha Peterson
31318-84
1981
$1,211.10
Novato,
California
Laurence R. Clarke
34490-84
1980
Glendale,
1981
California
Paul O. Brohmer
126-85
1978
$1,754.54
Los Altos,
1979
1,566.37
California
1980
385.87
1981
1,887.60
William I. and Glenna F. Graham
126-85
1983
$2,074.80
Oklahoma City,
Oklahoma
Jean A. Baumann
6123-85
1982
$ 660.60
San Diego,
California
David K. and Peggy S. Hughes
8339-85
1981
$1,324.50
Poway,
California
Paul R. and Phyllis J. Douglass
10859-85
1979
[1]
$3,769.00
Fort Myers,
1982
[1]
9,634.00
Florida
Mearl W. and Verna J. Chapman
12358-85
1977
[1]
Chula Vista,
1978
[1]
$1,311.00
California
1979
[1]
2,297.19
1980
[1]
1981
[1]
3,187.20
Edward and Joan Condiotti
12358-85
1978
[1]
$2,196.00
Orange,
1979
[1]
6,831.90
California
1981
[1]
946.50
James M. and Betty J. Field
13473-85
1978
[1]
$2,445.60
El Paso,
1979
[1]
2,464.20
Texas
1980
[1]
387.60
1981
[1]
1,588.20
1982
[1]
4,330.74
Glenn D. and Nancy R. Johnson
13473-85
1981
$ 661.80
Santee,
California
Virginia G. Keane
15725-85
1978
[1]
$ 679.50
Spring Valley,
1981
[1]
1,716.60
California
Norbert A. and Virginia P. Hulsman
18606-85
1978
[1]
$ 1,090.00
Solana Beach,
1979
[1]
2,494.13
California
1980
[1]
3,148.67
1981
[1]
19,218.25
Wesley H. and Marilyn G. Hillendahl
24858-85
1978
[1]
$ 3,103.00
Santa Rosa,
1979
[1]
3,652.00
California
1981
[1]
12,655.50
1982
[1]
3,604.50
1983
[1]
3,742.50
Robert and Loriel McKee
35031-85
1978
[1]
$ 2,287.00
Brentwood,
1981
[1]
691.00
California
1982
[1]
814.00
James W. and Shirley Henricks
4957-86
1982
[1]
$12,594.00
Novato,
California
Richard J. and Denese W. Todd
8227-86
1979
[1]
$ 2,978.00
Houston,
1980
[1]
3,564.00
Texas
1981
[1]
27,676.00
1982
[1]
2,584.00
*239 APPENDIX B
STATEMENTS OF PROJECTED TAXABLE INCOME OR (LOSS);
PROJECTED CASH FLOW FROM OPERATIONS
(BEFORE TAX); AND PROJECTED CASH FLOW
(AFTER TAX) FOR THE PERIOD
DECEMBER 14, 1980, TO DECEMBER 31, 1995, FOR A MARRIED
INDIVIDUAL FILING A JOINT RETURN
AND PURCHASING ONE UNIT
1980
1981
1982
1983
PROJECTED TAXABLE INCOME
OR (LOSS)
Lease Revenue
$29,700 $32,400 $32,400 Expenses: Maintenance (4)
0 3,740 4,080 4,080 Insurance (5)
75 937 900 900 Interest (6)
0 12,645 13,210 12,564 Depreciation (7)
21,333 16,459 16,459 16,459 Total expenses
21,408 33,781 34,649 34,003 PROJECTED CASH FLOW
(AFTER TAX)
Taxable income or (loss)
($21,408)
($ 4,081)
($ 2,249)
($ 1,603)
Tax benefit or (cost)
at 50% federal income
tax rate
10,704 2,041 1,125 802 (Deferred) (9)
(870)
(802)
Cash flow from operations
(before tax)
(75)
3,303 3,725 3,725 Investment
(26,000)
Investment tax credit (10)
26,000 Projected cash flow
(after tax)
$10,629 $ 5,344 $ 3,980 $ 3,725 *240 STATEMENTS OF PROJECTED TAXABLE INCOME OF (LOSS);
PROJECTED CASH FLOW FROM OPERATIONS
(BEFORE TAX); AND PROJECTED CASH FLOW
(AFTER TAX) FOR THE PERIOD
DECEMBER 14, 1980, TO DECEMBER 31, 1995, FOR A MARRIED
INDIVIDUAL FILING A JOINT RETURN
AND PURCHASING ONE UNIT
1984
1985
1986
PROJECTED TAXABLE INCOME
OR (LOSS)
Lease Revenue
$32,400 $32,400 $32,400 Expenses: Maintenance (4)
4,080 4,080 4,080 Insurance (5)
900 900 900 Interest (6)
11,877 11,148 10,374 Depreciation (7)
16,459 16,459 16,459 Total expenses
33,316 32,587 31,813 PROJECTED CASH FLOW
(AFTER TAX)
Taxable income or (loss)
($ 916)
($ 187)
$ 587 Tax benefit or (cost)
at 50% federal income
tax rate
458 94 (294)
(Deferred) (9)
(458)
(94)
294 Cash flow from operations
(before tax)
3,725 3,725 3,725 Investment
Investment tax credit (10)
Projected cash flow
(after tax)
$ 3,725 $ 3,725 $ 3,725 STATEMENTS OF PROJECTED TAXABLE INCOME OR (LOSS);
PROJECTED CASH FLOW FROM OPERATIONS
(BEFORE TAX); AND PROJECTED CASH FLOW (AFTER TAX) FOR THE PERIOD
DECEMBER 14, 1980, TO DECEMBER 31, 1995, FOR A MARRIED
INDIVIDUAL FILING A JOINT RETURN AND PURCHASING ONE UNIT
1987
1988
1989
1990
1991
PROJECTED TAXABLE INCOME
OR (LOSS)
Lease Revenue
$32,400 $32,400 $32,400 $32,400 $32,400 Expenses: Maintenance (4)
4,080 4,080 4,080 4,080 4,080 Insurance (5)
900 900 900 900 900 Interest (6)
9,552 8,680 7,754 6,771 5,727 Depreciation (7)
16,459 16,459 16,459 16,459 16,459 Total expenses
30,991 30,119 29,193 28,210 27,166 PROJECTED CASH FLOW
(AFTER TAX)
Taxable income or (loss)
$ 1,409 $ 2,281 $ 3,207 $ 4,190 $ 5,234 Tax benefit or (cost)
at 50% federal income
tax rate
(705)
(1,141)
(1,604)
(2,095)
(2,617)
(Deferred) (9)
705 1,141 84 Cash flow from operations
(before tax)
3,725 3,725 3,725 3,725 3,725 Investment
Investment tax credit (10)
Projected cash flow
(after tax)
$ 3,725 $ 3,725 $ 2,205 $ 1,630 $ 1,108 *241 STATEMENTS OF PROJECTED TAXABLE INCOME OR (LOSS);
PROJECTED CASH FLOW FROM OPERATIONS
(BEFORE TAX); AND PROJECTED CASH FLOW (AFTER TAX) FOR THE PERIOD
DECEMBER 14, 1980, TO DECEMBER 31, 1995, FOR A MARRIED
INDIVIDUAL FILING A JOINT RETURN AND PURCHASING ONE UNIT
1992
1993
1994
1995
PROJECTED TAXABLE INCOME
OR (LOSS)
Lease Revenue
$32,400 $32,400 $32,400 $32,400 Expenses: Maintenance (4)
4,080 4,080 4,080 4,080 Insurance (5)
900 900 900 900 Interest (6)
4,619 3,442 2,193 866 Depreciation (7)
16,459 16,459 16,459 8,241 Total expenses
26,058 24,881 23,632 14,087 PROJECTED CASH FLOW
(AFTER TAX)
Taxable income or (loss)
$ 6,342 $ 7,519 $ 8,768 $18,313 Tax benefit or (cost)
at 50% federal income
tax rate
(3,171)
(3,760)
(4,384)
(9,157)
(Deferred) (9)
Cash flow from operations
(before tax)
3,725 3,725 3,725 3,725 Investment
Investment tax credit (10)
Projected cash flow
(after tax)
$ 554 ($ 35)
($ 659)
($ 5,432)
ANALYTICAL MODEL OF TAXABLE INCOME OR (LOSS);
CASH FLOW FROM OPERATIONS (BEFORE TAX); AND CASH FLOW
(AFTER TAX) FOR THE PERIOD OCTOBER 1, 1982, TO
DECEMBER 31, 2002, FOR AN INDIVIDUAL PURCHASING ONE UNIT
1982
1983
1984
1985
Taxable Income (loss)
Assumed revenues
Beginning October 1, 1982
$ 7,500 $38,160 $47,191 $50,022 Expenses: Maintenance
680 4,080 4,080 4,080 Insurance
225 900 900 900 Imputed Interest
9,227 13,841 13,841 Depreciation
39,000 57,200 54,600 54,600 Total Expenses
39,905 71,407 73,421 73,421 Taxable income (loss)
($32,405)
($33,247)
($26,230)
($23,399)
Cash Flow (After Tax)
Taxable income (loss)
($32,405)
($33,247)
($26,230)
($23,399)
Tax benefit (cost) at 50%
Federal income tax rate
16,202 16,623 13,115 11,699 Cash flow from operations
(before tax)
6,595 9,164 18,201 21,032 Investment
(52,000)
Investment tax credit
26,000 Cash flow (after tax)
($ 3,203)
$25,787 $31,316 $32,731 *242 ANALYTICAL MODEL OF TAXABLE INCOME OR (LOSS);
CASH FLOW FROM OPERATIONS (BEFORE TAX); AND CASH FLOW
(AFTER TAX) FOR THE PERIOD OCTOBER 1, 1982, TO
DECEMBER 31, 2002, FOR AN INDIVIDUAL PURCHASING ONE UNIT
1986
1987
1988
1989
1990
Taxable Income (loss)
Assumed revenues
Beginning October 1, 1982
$53,024 $56,205 $59,577 $63,152 $66,941 Expenses: Maintenance
4,080 4,080 4,080 4,325 4,584 Insurance
900 900 900 900 900 Imputed Interest
13,841 13,841 13,841 13,841 13,841 Depreciation
54,600 Total Expenses
73,421 18,821 18,821 19,066 19,325 Taxable income (loss)
($20,397)
$37,384 $40,756 $44,086 $47,616 Cash Flow (After Tax)
Taxable income (loss)
($20,397)
$37,384 $40,756 $44,086 $47,616 Tax benefit (cost) at 50%
Federal income tax rate
10,198 (18,692)
(20,378)
(22,043)
(23,808)
Cash flow from operations
(before tax)
24,034 27,215 30,587 33,917 37,447 Investment
Investment tax credit
Cash flow (after tax)
$34,232 $ 8,523 $10,209 $11,874 $13,639 ANALYTICAL MODEL OF TAXABLE INCOME OR (LOSS);
CASH FLOW FROM OPERATIONS (BEFORE TAX); AND CASH FLOW
(AFTER TAX) FOR THE PERIOD OCTOBER 1, 1982, TO
DECEMBER 31, 2002, FOR AN INDIVIDUAL PURCHASING ONE UNIT
1991
1992
1993
1994
1995
Taxable Income (loss)
Assumed revenues
Beginning October 1, 1982
$70,958 $75,215 $79,728 $84,512 $89,582 Expenses: Maintenance
4,859 5,151 5,460 5,788 6,135 Insurance
900 900 900 900 900 Imputed Interest
13,841 13,841 13,841 13,841 13,841 Depreciation
Total Expenses
19,600 19,892 20,201 20,529 20,876 Taxable income (loss)
$51,358 $55,323 $59,527 $63,983 $68,706 Cash Flow (After Tax)
Taxable income (loss)
$51,358 $55,323 $59,527 $63,983 $68,706 Tax benefit (cost) at 50%
Federal income tax rate
(25,679)
(27,661)
(29,763)
(31,991)
(34,353)
Cash flow from operations
(before tax)
41,189 45,154 49,358 53,814 58,537 Investment
Investment tax credit
Cash flow (after tax)
$15,510 $17,493 $19,595 $21,823 24,184 *243 ANALYTICAL MODEL OF TAXABLE INCOME OR (LOSS);
CASH FLOW FROM OPERATIONS (BEFORE TAX); AND CASH FLOW
(AFTER TAX) FOR THE PERIOD OCTOBER 1, 1982, TO
DECEMBER 31, 2002, FOR AN INDIVIDUAL PURCHASING ONE UNIT
1996
Taxable Income (loss)
Assumed revenues
Beginning October 1, 1982
$94,957 Expenses: Maintenance
6,503 Insurance
900 Imputed Interest
13,841 Depreciation
Total Expenses
21,244 Taxable income (loss)
$73,713 Cash Flow (After Tax)
Taxable income (loss)
$73,713 Tax benefit (cost) at 50%
Federal income tax rate
(36,856)
Cash flow from operations
(before tax)
63,544 Investment
Investment tax credit
Cash flow (after tax)
$26,688 ANALYTICAL MODEL OF TAXABLE INCOME OR (LOSS);
CASH FLOW FROM OPERATIONS (BEFORE TAX); AND CASH FLOW
(AFTER TAX) FOR THE PERIOD OCTOBER 1, 1982, TO
DECEMBER 31, 2002, FOR AN INDIVIDUAL PURCHASING ONE UNIT
1997
1998
1999
2000
2001
2002
Taxable Income
(loss)
Assumed revenues
Beginning October
1, 1982
$100,655 $106,694 $113,096 $119,882 $127,075 $147,700 Expenses: Maintenance
6,893 7,307 7,745 8,210 8,702 9,225 Insurance
900 900 900 900 900 900 Imputed Interest
13,841 13,841 13,841 13,841 13,841 13,841 Depreciation
Total Expenses
21,634 22,048 22,486 22,951 23,443 23,966 Taxable income
(loss)
$ 79,021 $ 84,646 $ 90,610 $ 96,931 $103,632 $123,734 Cash Flow
(After Tax)
Taxable income
(loss)
$ 79,021 $ 84,646 $ 90,610 $ 96,931 $103,632 $123,734 Tax benefit(cost)
at 50%
Federal income
tax rate
(39,510)
(42,323)
(45,305)
(48,465)
(51,816)
(61,867)
Cash flow from
operations
(before tax)
68,852 74,477 80,441 86,762 93,463 113,565 Investment
Investment tax
credit
Cash flow
(after tax)
$ 29,342 $ 32,154 $ 35,136 $ 38,297 $ 41,647 $ 51,698 *244 Footnotes
1. The "test case petitioners' listed below are consolidated herewith. Because of the use of joint petitions in these proceedings, the test case petitioner(s) in each docket number are not necessarily the first petitioner(s) listed in their respective petitions. They are set forth below in all capital letters and are listed by caption of the first petitioner(s) in each petition followed by a parenthetical of the test case petitioner(s), if the first petitioner(s) in that docket number are not the test case petitioner(s), and by the docket number. The test case petitioners consolidated herewith are as follows: Donald M. Angotti and LaVerne M. Angotti, et al. (as to MARTHA PETERSON only), docket No. 31318-84; LAURENCE R. CLARKE, docket No. 34490-84; Ralph W. Armstrong and Bonnie J. Armstrong, et al. (as to PAUL O. BROHMER and as to WILLIAM I. GRAHAM and GLENNA F. GRAHAM only), docket No. 126-85; Walt W. Ankerman and Gerri L. Ankerman, et al. (as to JEAN A. BAUMANN only), docket No. 6123-85; Ralph Q. Adams and Jo D. Adams, et al. (as to DAVID K. HUGHES and PEGGY S. HUGHES only), docket No. 8339-85; Paul O. Allen and Leslie G. Allen, et al. (as to PAUL R. DOUGLASS and PHYLLIS J. DOUGLASS only), docket No. 10859-85; Jeanette E. Andrews, et al. (as to MEARL W. CHAPMAN and VERNA J. CHAPMAN and as to EDWARD CONDIOTTI and JOAN CONDIOTTI only), docket No. 12358-85; Frederick B. Adair and Twyla J. Adair, et al. (as to JAMES M. FIELD and BETTY J. FIELD and as to GLENN D. JOHNSON and NANCY R. JOHNSON only), docket No. 13473-85; Sylvia Altman, et al. (as to VIRGINIA G. KEANE only), docket No. 15725-85; Joshua Alpern and Ronny Alpern, et al. (as to NORBERT A. HULSMAN and VIRGINIA P. HULSMAN only), docket No. 18606-85; Eugene C. Bowser and Louise M. Bowser, et al. (as to WESLEY H. HILLENDAHL and MARILYN G. HILLENDAHL only), docket No. 24858-85; Raymond H. Steinhardt and Fleur Steinhardt, et al. (as to ROBERT McKEE and LORIEL McKEE only), docket No. 35031-85; Max Alper and Florence Alper, et al. (as to JAMES W. HENRICKS and SHIRLEY HENRICKS only), docket No. 4957-86; and Thomas A. Blake and Shirley Blake, et al. (as to RICHARD J. TODD and DENESE W. TODD only), docket No. 8227-86.↩
2. Petitioners argue that the license agreement between FOI and Senter did not give Senter the right to sell the Oxytrol systems. Although this may be correct as a matter of patent law, the president of Senter testified in detail regarding its efforts to sell the systems. His testimony indicated that Senter's lack of success was due to the unwillingness of potential buyers to pay $10,000 for the Oxytrol system and not the inability of Senter legally to sell such systems.↩
3. Beginning in May 1981, container sales were actually made by FoodSource Sales, Inc., a corporation wholly owned by Dixon. For simplicity, both FoodSource and FoodSource Sales, Inc., are hereinafter referred to as FoodSource.↩
4. Respondent's Exhibit DF contains Budd's records indicating when such release occurred. The records were prepared by or at the direction of Carl H. Wheeler (General Manager of Budd), and he authenticated them at trial. Petitioners do not dispute their factual accuracy, although they contest the legal significance of the release dates.↩
5. FoodSource's chief of operations testified that 20 percent of the containers operated by FoodSource were actually used as controlled atmosphere containers. The only specific and reliable evidence in the record with respect to commercial↩ usage of the containers, however, were the leases between FoodSource and the container users. Those leases indicate that controlled atmosphere usage was de minimis relative to noncontrolled atmosphere usage.
6. For various reasons, including time constraints, not all test case petitioners testified at trial. Hillendahl, Todd, and Henricks did testify, and we have thus made specific findings of fact with respect to them. They are, in the view of respondent and the Court, atypical for reasons appearing below. Petitioners do not assert that these three are representative investors. Although petitioner Robert McKee (McKee), who was primarily responsible for design of the Nitrol container, testified at trial, his testimony did not relate to his own purchases of container interests. The Court indicated during trial that we would not decide the profit objective issue adversely to any petitioner without affording him or her a later opportunity to testify on that issue. Thus this opinion may be supplemented at a later time with specific findings as to other petitioners whose tax liability is not resolved by application of our general findings and the reasoning in this opinion. The profit objective issue, however, may be resolved on a case-by-case consideration of the ways in which a petitioner's circumstances are similar to or different than those of Hillendahl, Todd, and Henricks.↩
7. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
8. Sec. 1.183-2(b), Income Tax Regs; lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed in the regulation are as follows: (1) Manner in which the taxpayer carries on the activity. * * * (2) The expertise of the taxpayer or his advisors. * * * (3) The time and effort expended by the taxpayer in carrying on the activity. * * * (4) Expectation that assets used in activity may appreciate in value. * * * (5) The success of the taxpayer in carrying on other similar or dissimilar activities. * * * (6) The taxpayer's history of income or losses with respect to the activity. * * * (7) The amount of occasional profits, if any, which are earned. * * * (8) The financial status of the taxpayer. * * * (9) Elements of personal pleasure or recreation.↩ * * *
17. The tax advantages may, of course, be limited or unallowable because of statutory provisions. See, for example, sec. 183↩.
9. Similarly, no interest deduction is allowable with respect to illusory debt. We cannot tell from the record or from the briefs of the parties to what extent, if any, interest expense of the notes in issue was disallowed by respondent or actually paid by petitioners.↩
10. A stipulated exhibit filed after trial purporting to show all payments on the substitute notes indicated that the only credits with respect to Todd's notes were for "revenues" and that the aggregate amount of such credits was less than the payments purportedly required by the notes.↩
11. At a meeting of sales representatives, in response to a question regarding the notes, Dixon stated: If we were going to -- frankly, if we were going to foreclose on people, we would have already done it. I mean, that isn't the way that we're set up to do it. We have no economic advantage in doing it that way. What we are trading with the new note program, what we are trading with the new note program is we are asking for some income now, to tie down a container owner's tax benefits. * * *↩
12. Cf. Chester v. Commissioner,T.C. Memo. 1986-355↩.
13. Our holding on this issue does not preclude, however, an increase in basis attributable to additional expenditures incurred during the years in issue (if any), such as improvements to the containers, that otherwise would properly be added to basis. Henricks' expenditures in 1982 are an example.↩
14. As support of the $260,000 value computed using the multiple of cost, Thomson alluded to two instances in which containers purportedly sold for $260,000 cash. The record, however, contains no reliable evidence of the terms, or even the existence, of the purported cash sales. Although at one point respondent's counsel apparently conceded that one investor purchased a container for cash, his statement included a representation that the purchaser was given a guaranteed return of income and contemplated all of the tax benefits promised by FoodSource.↩
15. In explaining the problems encountered by FoodSource in one of his reports to investors, Dixon described substantial expenditures for advertising. It appears, however, that those expenditures were directed at selling investments in the containers rather than promoting actual use of containers by the industry.↩
16. Sec. 6621(d) provides in part as follows: (d) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b). (2) Substantial underpayment attributable to tax motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000. (3) Tax motivated transactions. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)↩), [Illegible Paragraph]
1. Amount to be determined. ↩
2. 50 percent of the interest due on $9,772.00. ↩
3. 50% of the interest due on $2,202.00. ↩
4. 50% of the interest due on $4,415.00. ↩
5. 50 percent of the interest due on $5,183.00. ↩
6. 50% of the interest due on $5,941.00. ↩
7. 50% of the interest due on $44,648.00. ↩
8. 50% of the interest due on $12,015.00. ↩
9. 50% of the interest due on $12,475.00. ↩
10. 50% of the interest due on $92,255.00. ↩
11. 50% of the interest due on $8,615.00.↩